## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| CHERYL SCOTT, DAVE O'QUINN, BRIAN J. KOSINSKI, and TRACIE M. THOMAS on behalf of themselves, the Caterpillar 401(k) Retirement Plan, and all those similarly situated, | ) ) ) ) | Case No. 1:17-cv-00679 Hon. Jeffrey T. Gilbert |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| AON HEWITT FINANCIAL ADVISORS, LLC; HEWITT ASSOCIATES, LLC D/B/A AON HEWITT; CATERPILLAR INC.; and JOHN DOES 1-50 | ) ) ) ) ) | |
| Defendants. | | |

### FIRST AMENDED CLASS ACTION COMPLAINT

### PRELIMINARY STATEMENT

1.      Plaintiffs Cheryl Scott, Dave O'Quinn, Brian J. Kosinski, and Tracie M. Thomas (together, "Plaintiffs") are participants in the Caterpillar 401(k) Retirement Plan (the "Caterpillar Plan" or the "Plan"). Plaintiffs bring this action on behalf of the Caterpillar Plan and as a class action on behalf of all similarly situated participants in and beneficiaries of the Caterpillar Plan and as a class action on behalf all similarly situated participants in and beneficiaries of all other qualified retirement plans for which Hewitt Associates, LLC D/B/A Aon Hewitt ("Aon") serves or has served as the provider of platform and record-keeping services for the Plan (together with the Caterpillar Plan, the "Plans"). They bring this action under Sections 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and 1132(a)(3), against Aon Hewitt Financial Advisors, LLC ("AFA") and Aon (together, AFA and Aon are the "Aon Defendants"), and against Caterpillar Inc. ("Caterpillar") and John Does 1-50 (together, Caterpillar and John Does 1-50 are the "Caterpillar Defendants").

2.     Plaintiffs are participants in the Caterpillar Plan, a retirement plan sponsored by Defendant Caterpillar Inc. ("Caterpillar"), Plaintiffs' current or former employer, and the class members are participants in or beneficiaries of the Plans.

3.     The Plans are participant-directed, individual account, ERISA-covered defined contribution ("DC") retirement plans covered by ERISA, within the meaning of ERISA § 3(2) and (34), 29 U.S.C. § 1002(2) and (34).

4.     Participant accounts in the Plans are comprised of employee contributions, any employer contributions and any investment income from the investment options selected within the participant account, *less fees and expenses*. *See Evans v. Akers*, 534 F.3d 65, 70 (1st Cir. 2008) ("A defined contribution plan 'promises the participant the value of an individual account at retirement.' ... This value is a function of the employee's contributions, plus vested employer matching contributions and investment gains, minus investment losses and any allocable expenses."). Each of the Plans, including the Caterpillar Plan, provides several investment options into which participants could direct their retirement savings.

5.     The Aon Defendants carried out a scheme to use their position as recordkeeper for the Plans to influence the Plans' named fiduciaries (the "Named Fiduciaries") to choose Financial Engines, LLC ("Financial Engines" or "FE") as an investment advisor for the Plans. As an investment advisor, Financial Engines allocated the account balances of Plan participants that elected to use Financial Engines' services among the available investment options, in exchange for a fee that it collected out of the Plan assets in those participants' accounts (the "Professional Account Management Program" or "PAM Program"). In exchange for getting it access to the Plans, Financial Engines paid the Aon Defendants a massive kickback. The kickback greatly inflated the cost of Financial Engines' services to Plan participants compared to the market rate

2

for comparable services, and far greater than the compensation Financial Engines was obviously willing to accept and the net compensation it actually received. As a result of the kickback, the fee for Financial Engines' services was excessive and unreasonable. The Aon Defendants were thereby able to divert tens of millions of dollars of the Class Member's retirement savings into their own pockets.

6.     The Caterpillar Defendants are the Caterpillar Plan's named or *de facto* fiduciaries. They had primary authority under the Caterpillar Plan to choose the Caterpillar Plan's service providers. As fiduciaries for the Caterpillar Plan, the Caterpillar Defendants had an obligation to take prudent steps to ensure that the Caterpillar Plan and its participants paid no more than a reasonable rate for Plan services. Here, on information and belief, the Caterpillar Defendants did not take any reasonable steps to investigate whether comparable or better services were available on the market for an equal or lesser rate than the Caterpillar Plan paid for the Financial Engines services. In addition, they failed to take any reasonable steps to investigate whether, as a result of the kickback to the Aon Defendants, the fee for Financial Engines' services was excessive and unreasonable. The Caterpillar Defendants' failure to make such a reasonable investigation, or to the extent they did so, their failure to implement the results of their investigation, resulted in the Caterpillar Plan and its participants paying much more for the Financial Engines' services that they could have paid for comparable services on the market from other providers.

**JURISDICTION**

7.     Plaintiffs bring this action pursuant to ERISA §§ 502(a)(2) and 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and (3).  This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this action arises under the laws of the United States.

3

8.      Pursuant to 29 U.S.C. § 1132(e)(2), venue is proper in this District because the Aon Defendants reside in or may be found in this District and at least some of the breaches occurred in this District.  Venue is also proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because, for the same reasons, a substantial part of the events or omissions giving rise to the claim occurred in this District.

## THE PARTIES

9.      At all relevant times, Plaintiff Cheryl Scott has been a participant in the Caterpillar Plan, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7).

10.     At all relevant times, Plaintiff Dave O'Quinn has been a participant in the Caterpillar Plan.

11.     At all relevant times, Plaintiff Brian J. Kosinski has been a participant in the Caterpillar Plan.

12.     At all relevant times, Plaintiff Tracie M. Thomas has been a participant in the Caterpillar Plan.

13.     At all relevant times, the Caterpillar Plan and the other Plans were employee pension benefit plans within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and were individual account plans within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

14.     Defendant AFA was organized in Delaware on January 7, 2011. AFA's principal place of business is 7201 Hewitt Associates Drive, Charlotte, North Carolina. AFA is a wholly-owned subsidiary of Aon.  AFA provided services to the Plan and other retirement plans for which Aon provided recordkeeping services.  AFA received direct and indirect compensation from the Plans, including the Caterpillar Plan.

15. Defendant Aon, the parent company of AFA, provides recordkeeping services to the Plan under the name "Aon Hewitt." Aon is an indirect, wholly-owned subsidiary of Aon Corporation, which is a publicly-held company whose stock is traded on the New York Stock Exchange under the symbol "Aon." Aon is based in Lincolnshire, Illinois and was organized in Illinois. Aon provided services to, and received direct and indirect compensation from, the Plans, including the Caterpillar Plan.

16. Defendant Caterpillar is a Delaware corporation with its principal place of business in Illinois. Caterpillar is the sponsor of the Caterpillar Plan and is the Plan administrator. Caterpillar is also a named fiduciary of the Caterpillar Plan.

17. Defendants John Does 1-50 are individual employees of Caterpillar, including but not limited to the members of the Benefits Fund Committee, who served as named or *de facto* fiduciaries of the Caterpillar Plan and who had or exercised authority or control over the selection of service providers for the Caterpillar Plan.

## GENERAL ALLEGATIONS

### The Caterpillar Plan and the Plans

18. The Caterpillar Plan and the other Plans allow participants to invest their retirement savings into a number of investment options.

19. As defined contribution ("DC") plans, the Caterpillar Plan and the other Plans provide that, at retirement, participants receive only the balance of their accounts—contributions, less fees, plus (or minus) investment returns.

20. Fiduciaries for a retirement plan owe the plan and its participants and beneficiaries duties described as among the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982); *Braden v. Walmart Stores, Inc.*, 588 F.3d 585, 602 (8th Cir. 2009).

21.     When choosing investment options and service providers for a Plan, an ERISA plan fiduciary is required to act loyally and prudently. ERISA § 404(a)(1), 29 U.S.C. 1104(a)(1). The duty of loyalty requires the plan's fiduciary to act solely in the interest of the plan and its participants. The duty of prudence requires the plan's fiduciary to act with the care, skill, prudence and diligence that would be exercised by someone who is experienced and knowledgeable about the services to be provided: a prudent expert, in other words.

22.     An ERISA fiduciary's duties thus include "choosing wise investments and monitoring investments to remove imprudent ones." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016). ERISA fiduciaries must therefore "conduct an adequate inquiry" – they must affirmatively undertake a reasonable investigation into the plan's options and review their past decisions periodically. *Id.* Under the common law of trusts, which informs ERISA's fiduciary duties, fiduciaries may "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007); *see also id.* cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function.")

23.     These fiduciary duties are especially important in the context of fees paid by defined contribution plan participants, as the fees reduce, dollar for dollar (and more, when compounded), the amount of benefits participants will receive at retirement.

24.     As the Supreme Court explained in 2015, in defined contribution plans, employees' benefits at retirement "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

25.     Thus, over time, even small differences in fees and performance compound and can result in vast differences in the amount of savings available at retirement; "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

26.     In the context of individual account defined contribution plans, additional fees of only 0.18% (eighteen hundredths of one percent, or 18 basis points) can have a large detrimental effect on investment results over time, because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1190 (9th Cir. 2016) (*en banc*).

27.     As set forth below, the Caterpillar Defendants selected Aon as the Caterpillar Plan's recordkeeper and platform provider. The Caterpillar Defendants subsequently caused the Plan to use Financial Engines' services—at first through the direct relationship with Financial Engines, and later through the indirect relationship via AFA.

28.     On information and belief, when the Caterpillar Defendants caused the Plan to hire Financial Engines, they did not fulfill their fiduciary obligation to conduct an adequate inquiry into whether comparable or better services to those provided by Financial Engines were available on the market at lower prices. Nor did they conduct an adequate inquiry into whether Financial Engines kicked back part of its fee to the Aon Defendants and, if so, whether that rendered the fee excessive and unreasonable. Or, to the extent they did undertake investigation with respect to these matters, they did not implement the results of their investigation. And, on information and belief, the Caterpillar Defendants have not subsequently undertaken a reasonable investigation into market alternatives to Financial Engines' services. Had they done so, as explained in more detail

below, they would have found a number of alternatives to Financial Engines on the market providing at least comparable services at lower prices.

29.    Moreover, on information and belief, the Caterpillar Defendants never investigated what services Aon was providing in connection with the Professional Account Management Program, or whether the Aon Defendants provided any material new, unique services—services in addition to those that the Aon Defendants were already providing as recordkeeper—in exchange for the fees they received from Financial Engines.

**Defendant Aon's Role as the Recordkeeper for the Plans**

30.    At the core of Aon's responsibilities as recordkeeper for the Plans, including the Caterpillar Plan, was keeping records of the value of the assets in each participant's individual account and the allocations each participant made among the available investment options.

31.    In addition, Aon was responsible for processing and recording transactions, including deposits into and withdrawals from each participant's account, and allocating the deposited or withdrawn sums to the designated investment options.

32.    Aon maintained a call center and an online web portal through which participants could obtain information about the value and allocation of their accounts and the available investment options offered by their Plans.

33.    In addition, participants could log into the online web portal or contact the call center to initiate transactions to or from their accounts or change how the existing funds in their accounts and/or new contributions would be allocated among the available investment options.

34.    Aon was responsible for recording those transactions and for ensuring that transactions initiated by participants were transmitted to a broker for execution.

35.     Aon also provided periodic statements to participants reflecting the value of their individual accounts and identifying the participants' investment allocations.

36.     On information and belief, Aon was also responsible for preparing the Form 5500 Annual Reports for the Plans.

37.     Aon provided all of the foregoing services regardless of whether the Plans hired Financial Engines or some other automated investment management service provider. Aon was compensated directly for those services pursuant to its agreements with the Plans.

### Financial Engines' Services

38.     As noted above, in participant directed individual account plans like the Plans, the participants' investment decisions can have a dramatic impact on the amount of retirement savings they end up with.

39.     Many participants do not feel comfortable making those decisions on their own, and seek guidance from investment advisors to help them manage their retirement savings.

40.     Financial Engines provides two related types of investment advice to DC plan participants.

41.     In both cases, Financial Engines collects data about the participants, including their age, their savings, their retirement goals and risk tolerance, and feeds that data through a computer program (called "Advice Engines") that automatically generates proposed investment allocations among the available investment options in their plans.

42.     For one program, the Online Advice Service (sometimes referred to below as "OAS"), having developed all the participant communications describing the program and with access to each participant's Plan account, current investments and contribution history, Financial Engines applies the Advice Engines program to  make recommendations to participants about how

9

to allocate their accounts among the Plan's available investment choices. Participants are free to accept or reject those recommendations.

43.     For the Online Advice Service, FE receives a fee on a per-participant basis, that is, a specific dollar amount for each participant eligible to use the program, which is usually all participants in the Plans. Typically, the Plans' sponsor pays FE's fee for the Online Advice Service. On information and belief, Caterpillar did so with respect to the OAS services provided by Financial Engines here.

44.     The Professional Account Management Program goes one step further.  In connection with the PAM Services, Financial Engines actually takes control of the participant's account, and implements the asset allocation generated through the Advice Engines algorithm. Regarding operation and management, the Online Advice Service and the PAM Services differ only in that, under the PAM Services, FE periodically implements the recommendations developed by its computer program.

45.     Under the PAM program, Financial Engines exercises "discretionary authority" over the allocation of participant accounts among the available investment options. *See* ECF No. 37-4, Financial Engines 2015 Annual Report Form 10-K ("FE Form 10-K"), at 4; *see also* ECF No. 37-5, FE Form ADV, Sched. 2, at 7.

46.     Financial Engines has represented publicly that it provides its Online Advice Service and the PAM services "as a fiduciary under [ERISA]." Exhibit 1 hereto, Letter of Financial Engines, at 1.

47.     The Advice Engines Program, as well as the OAS and PAM Services, were developed, are maintained, and are provided exclusively by Financial Engines.

**The Market for Automated Investment Management in DC Plans**

48.    During the class period, other companies offered DC plans automated investment management services that were comparable to Financial Engines' services. Many of those competitors provided their comparable services for less than Financial Engines charged for the PAM Services.

49.    For example, providers such as Blooom and Betterment for Business provided automated account management services that were comparable to those provided by Financial Engines and would have cost the Plan cost a fraction what Financial Engines charged.

50.    Other recordkeepers besides Aon, such as Merrill Lynch and Transamerica, also offered their own automated account management program, many, including Merrill Lynch and Transamerica, for no extra charge beyond the baseline recordkeeping fee.

**Financial Engines' Kickbacks to the Aon Defendants**

51.    In order to make money, Financial Engines needed access to customers, especially individual account, DC plan participants like those in the Plans. Each large DC plan that used Financial Engines yields thousands, or even tens of thousands, of potential new customers for Financial Engines.

52.    Recordkeepers, like Defendant Aon, who have established relationships with many large DC plans can provide service providers like Financial Engines with access to the customers that Financial Engines needed.

53.    Financial Engines admits that it "primarily" relied on relationships with recordkeepers like Aon to sell its services to plan participants. FE Form 10-K, at 4.

54.    Because Financial Engines wanted access to the customers that the recordkeepers can provide, Financial Engines was willing to pay the recordkeepers or their affiliates for that access. This was nothing more than a classic pay-to-play scheme.

55. Aon, as recordkeeper, entered into an exclusive arrangement with Financial Engines, as evidenced by the Master Services Agreement (sometimes referred to below as the "MSA") (ECF No. 58-3, under seal) between Aon and Financial Engines, as discussed below, which provided ████████████████████████████████████████ ██████, in connection with the PAM services, Aon supplied no substantial services and incurred none of the cost of program development.

56. Thus, Aon and Financial Engines entered into a *quid pro quo* arrangement whereby Financial Engines would pay to Aon a significant portion of the fee it received for its managed account services in return for (a) Aon's grant to Financial Engines of exclusive access to Aon's DC plan clients, including the Caterpillar Plan and the other Plans, and (b) Aon's agreement to attempt to influence its DC plan clients to retain Financial Engines.

57. Financial Engines and the recordkeepers it deals with structured their relationships with plans in one of two ways: either as a "direct advisory relationship", where Financial Engines and the Plan entered into a direct relationship with each other, or indirectly as a "subadvisory relationship", where the recordkeeper or its affiliate "is the primary advisor and plan fiduciary" and Financial Engines "act[s] in a subadvisory capacity." FE Form 10-K, at 9-10.

58. With respect to the "direct advisory relationship" and the indirect "subadvisory relationship," there was no substantive difference in the services provided or which entity provided the service. In both cases, Financial Engines provided exactly the same investment advisory and managed account services. While in the subadvisory relationships, the services were marketed under the brand name of the recordkeeper or its affiliate (here, Defendant AFA) and "identified as 'powered by Financial Engines,'" all of the services were actually provided by Financial Engines under both structures. FE Form 10-K, at 9-10.

59.     The fees paid to the recordkeepers or their affiliates took different forms under the arrangements, but were substantively the same:

    a.  Under the "direct advisory relationships", Financial Engines – which was paid directly by the Plan – "pay[s] fees to the [recordkeeper or its affilate] for facilitating the exchange of plan and plan participant data as well as implementing our transaction instructions for member accounts."

    b.  In the indirect, subadvisory relationship, "[r]evenue is collected by the plan provider who then pays a subadvisory fee" to Financial Engines. FE Form 10-K, at 9-10.

    c.  In both cases, the recordkeeper or its affiliate was not providing any material services; all of the investment advisory and managed account services were actually being provided by Financial Engines.

    d.  Regardless of whether the fees were collected directly from the Plans (out of which a portion was paid to FE) in the subadvisory relationship, or collected indirectly from Financial Engines in the "direct advisory relationship," the fees received by the recordkeepers or their affiliates were nothing more than a kickback.

60.     The Aon Defendants and Financial Engines used both the direct and indirect relationships to secure Aon Defendants' kickbacks.

    a.  Effective March 13, 2009, the MSA provided



ECF No. 58-3 (under seal).

    b.  Effective March 7, 2011, Financial Engines and AFA entered into the "Advisory and Data Services Agreement (the "ADSA"), which provided

████████████████████████████████████

██████████████████████ ECF No. 58-1 (under seal). Under the subadvisory structure, the Plans paid AFA, which remitted a portion of the proceeds to Financial Engines.

c.  Some of the Plans retained Financial Engines directly through the direct advisory relationship. Other Plans retained AFA through the indirect, subadvisory relationship. And some of the Plans, such as the Caterpillar Plan, began with the direct advisory relationship, and then migrated to the subadvisory relationship.

d.  As noted above, there was no substantive difference between the two structures in terms of services provided and who provided them. The only difference was that in the indirect relationship, AFA was interposed as an intermediary registered investment advisor between the Plans and Financial Engines but, in fact, AFA provided no investment advisory services that were not provided by Financial Engines.

61.  The payments to Aon Defendants came at great cost to the Plans and the participants who opted into the PAM services. Financial Engines set the price of the PAM services it would offer to the Plans higher than necessary and higher than the market rate in order to pay the kickback to Aon. Because Aon was working to ensure that the Plans chose Financial Engines, Financial Engines' prices were never subjected to full market competition. The kickbacks and/or payments for no services to Defendants ultimately came out of the pockets of the Plans' participants, and increased the cost they paid for the PAM Services.

62.  Of course, the *quid pro quo* required by Financial Engines was that the Aon Defendants would continue to offer only the Financial Engines programs and would use its

influence, including its influence as the recordkeeper for the Plans, to get customers for Financial Engines.

63.     The Aon Defendants agreed with Financial Engines that they would use their status and influence as the Plans' recordkeeper to market Financial Engines' services to the Plans and their participants.

64.     In particular, under the Master Services Agreement, ███████████████████ ██████████████████████████████████████████████████ ██████████████████████ (MSA ¶¶ 2(c), 4(a)). ██████████████████ ██████████████████

  ▪  ██████████████████████████████████████

     ██████████████████████████████████████

     ████████████████████████████

  ▪  ██████████████████████████████████████

     ██████████████████████████████████████

     ██████████████████████████████████████

     ████████████████████

  ▪  ██████████████████████████████████████

     ██████████████████████████████████████

     ██████████████████████████████████████

     ████████████████████████████

  ▪  ██████████████████████████████████████

     ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

■  ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

■  ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

65.    Under  the  ADSA  between  AFA  and  Financial  Engines,  ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████  ADSA ¶ 2(C) & (D)).

    a.   The Client Engagement Protocol provided:

        i.   ████████████████████████████████████████████

████████████████████████████  (ADSA Ex. C ¶¶ I(A)(1)-(11), (B)(2)-

(10)); and

        ii.   ████████████████████████████████████████████

████████████████  (ADSA Ex. C ¶¶ I(B)(1));

    b.   ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████  ADSA Ex. D).

66.     On information and belief, the Aon Defendants in fact did undertake such marketing efforts, directly or indirectly involving themselves in Financial Engines' negotiations with the Plans regarding the PAM Services, and thereby exercised de facto control over the Plans' decisions to retain Financial Engines, through the following actions, asserted on the basis of information and belief:

a.     Marketing only Financial Engines' services to the Plans' named fiduciaries,

b.     declining to market or suggest any competitor of Financial Engines to the Plans' named fiduciaries,

c.     using the influence it has as the Plans' primary service provider to encourage the Plans' named fiduciaries to use Financial Engines, and

d.     essentially refusing to work with any individualized, automated account management services provider except Financial Engines, thereby requiring Plans to change recordkeepers if they wanted to use a  provider other than Financial Engines.

67.     On information and belief, as a result of the Aon Defendants' efforts and influence, Financial Engines was the only provider of individualized, automated investment advice and personalized automated managed account services for plans that Aon served as recordkeeper.

68.     On information and belief, few, if any, of the Plans undertook competitive bidding for individualized, automated investment advice and personalized automated managed account service providers or evaluated whether better options than Financial Engines were available in the marketplace.

69.     Aon thus converted the Plans' opportunity to get those services in order to ensure that Financial Engines would be retained, thereby securing for Aon the lucrative payments from Financial Engines.

**The Kickbacks Greatly Increased the Total Compensation to the Aon Defendants Even though the Aon Defendants Did Not Provide Any Material Additional Services in Exchange**

70.     Financial Engines, through its Advice Engines software and related products, provided all of the investment advice and PAM under both the direct and indirect subadvisory relationships. While the Financial Services Agreement ("FSA") incorporated into the ADSA requires AFA to provide advice services and account management to the Plans, all of those services under the FSA were actually provided by Financial Engines:

a.     "AFA has hired Financial Engines Advisors LLC to provide sub-advisory services. *We rely exclusively on* the proprietary software systems and methodology developed and maintained by *Financial Engines Advisors LLC,* an SEC-registered investment advisor, which is unaffiliated with AFA or any of our "affiliated companies, *to create target allocations for participants.* AFA Form ADV, ECF No. 37-1, at 4 (emphasis added).

71.     As alleged above, Plaintiff contends that all of the money paid to AFA and Aon was simply a kickback. The Master Services Agreement recited that the payments from FE to Aon were ███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████ MSA, at AON00000089, Exhibit B. The ADSA did not

expressly recite that AFA's share of the fees was in exchange for any particular services being performed by AFA.

72. Both the ADSA and the Master Services Agreement indicated that ███████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████ ADSA ¶ 6(B); MSA ¶ 4(b).

73. But recording, storing and transmitting data about plan investment options, participant accounts, participant elections and participant transactions were the very services that Aon provided as recordkeeper. Thus, even if the "data transmission" services described in the Master Services Agreement and ADSA were services that Aon provided, Aon was already obligated to provide those services—and was compensated for providing them—as the Plans' recordkeeper under the various administrative services agreements.

74. This arrangement is particularly troubling because Aon and AFA received asset-based compensation for their purported services—for which there is no rational or economic justification. The cost and value of data transmission did not change appreciably when the number of participants in a Plan using FE's services increased or the amount they invested went up, but the Aon Defendants' fees increased. Even if the Aon Defendants were actually providing new services in exchange for the fees it received, an asset-based fee for a fixed level of service was on its face unreasonable.

75. As a result of the Aon Defendants' pay-to-play scheme and the resulting kickbacks and/or double-dipping the Aon Defendants took from the accounts of Plaintiffs and the other class members, the total cost of the PAM Services was increased significantly. The additional fees for

Aon and AFA simply inflated the cost to participants, without providing any additional value to the participants in exchange.

76.     Even if the compensation received by Aon and/or AFA in connection with the PAM Program is not duplicative of fees already being paid for recordkeeping services, and Financial Engines requires some other separate data connection, Financial Engines, as a single party, requires only one connection to Aon's system in order to service all of the plans on Aon's recordkeeping platform that offered the PAM Program to its participants.  Yet Aon and/or AFA was collecting a similar fee from each and every one of those plan customers.  ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████

## CLASS ACTION ALLEGATIONS

77.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek to certify, and to be appointed as representatives of, two classes, the "Caterpillar Class" and the "Aon Plan Class."

78.     As used herein, the term "Class Period" refers to the time between January 27, 2011 and the date of trial in this matter.

79.     The Caterpillar Class includes:

> All participants in and beneficiaries of the Caterpillar Plan, who, at any time during the Class Period, paid any fees to Financial Engines or AFA from their account in the Caterpillar Plan.

80.     The Aon Plan Class includes:

> All participants in and beneficiaries of any ERISA covered individual account plan for which the Aon Defendants provided recordkeeping or platform services, who, at any time during the Class Period, paid any fees to Financial Engines or AFA from their Plan account.

81. Both the Caterpillar Class and the Aon Plan Class meet the requirements of Rule 23.

82. Both the Caterpillar Class and the Aon Plan Class include thousands of members and are so large that joinder of all members would be impracticable.

83. There are numerous questions of law and fact common to the Caterpillar Class, because the Caterpillar Defendants breached their fiduciary conduct as alleged herein in common with respect to all participants in and beneficiaries of the Caterpillar Plan. Thus, common questions of law and fact include the following:

a. Whether the Caterpillar Defendants conducted an adequate inquiry into the availability and cost of automated investment management providers on the market at any time during the Class Period;

b. Whether the Caterpillar Defendants conducted an adequate inquiry into whether the fees paid to the Aon Defendants constituted additional compensation for the recordkeeping services that the Aon Defendants were already providing; and

c. If they did conduct such an inquiry, whether the Caterpillar Defendants took appropriate steps to implement the results of their investigation.

84. There are numerous questions of law and fact common to the Aon Plan Class, because the Aon Defendants engaged in substantially the same course of conduct with respect to all of the Plans with participants or beneficiaries in the class. Thus, common questions of law and fact include the following:

a.  what arrangements were made between the Defendants and Financial Engines concerning payments to the Aon Defendants from the fees paid;

b.  what services the Aon Defendants and Financial Engines performed;

c.  whether the Aon Defendants knowingly or gratuitously received the benefits from the prohibited transactions alleged herein;

d.  how the losses to the Plans resulting from each prohibited transaction are to be calculated; and

e.  what Plan-wide equitable and other relief the Court should impose in light of the Defendants' misconduct.

85.  Plaintiffs' claims are typical of the claims of both Classes because Plaintiffs were Plan participants during the Class Period, utilized Financial Engines' services, and were harmed by precisely the same misconduct by the Caterpillar Defendants as were all other members of the Caterpillar Class and by precisely the same misconduct by the Aon Defendants as were all other members of the Aon Plan Class.

86.  Plaintiffs are adequate representatives of the Caterpillar Class and the Aon Plan Class because Plaintiffs were participants in the Caterpillar Plan during the proposed Class Period; they paid fees to Financial Engines and/or AFA during the Class Period; have no interest that conflicts with other members of the proposed Classes; are committed to the vigorous representation of the Classes; and have engaged experienced and competent attorneys to represent the Classes.

87.  Prosecution of separate actions by an individual retirement plan participants, beneficiaries or fiduciaries for these breaches of fiduciary duties and prohibited transactions would create the risk of inconsistent or varying adjudications that would establish incompatible standards

of conduct for the Aon Defendants and the Caterpillar Defendants. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

88.     A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all members of either Class would be impracticable; the losses suffered by individual members of the Classes may be small; it may be impractical for individual participants and beneficiaries to enforce their rights through individual actions; and common questions of law and fact predominate over individual questions. Given the nature of the allegations, no member of either class has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

89.     Plaintiffs' counsel will fairly and adequately represent the interests of both Classes and are best able to represent the interests of the Classes under Rule 23(g).

**COUNT I**
**On Behalf of the Caterpillar Class**
**Breach of Fiduciary Duty**
**ERISA § 404(a)(1), 29 U.S.C § 1104(a)(1)**
**Against the Caterpillar Defendants**

90.     Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

91.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) requires ERISA plan fiduciaries to perform their fiduciary duties and responsibilities (i) solely in the best interests of Plan participants for the exclusive purpose of providing them benefits under the Plan, and (ii) with the care, skill, prudence and diligence under the circumstances then prevailing that prudent person, familiar with such matters, would exercise.

92.     The Caterpillar Defendants breached their duty of prudence under ERISA § 404(a)(1) by:

    a.  Failing to conduct an adequate inquiry into the availability and cost of automated investment management providers on the market at any time during the Class Period;

    b.  Failing to conduct an adequate inquiry into whether the fees paid to the Aon Defendants constituted additional compensation for the recordkeeping services that the Aon Defendants were already providing or were reasonable fees in relation to the services being provided by Aon in connection with the PAM Program; and

    c.  Failing to take appropriate steps to implement the results of any such inquiry.

93.     These fiduciary failures caused the Caterpillar Plan and Caterpillar Class to pay significant extra fees for the automated investment management services provided by Financial Engines beyond the reasonable market value of those services.

94.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) permits plan participants, such as Plaintiffs, to bring civil actions for "appropriate relief" under ERISA § 409, 29 U.S.C. § 1109.

95.     Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties, including ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) must "make good" to the plan the losses to the plan resulting from its imprudence, and is "subject to such other equitable or remedial relief as the court may deem appropriate."

96.     Under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), the Caterpillar Defendants are liable, in an amount to be determined at trial, for the losses to the Caterpillar Plan caused by their violations of ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

24

**COUNT II**
**On Behalf of the Caterpillar Class**
**Prohibited Transaction**
**ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1)**
**Against the Caterpillar Defendants**

97.     Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

98.     ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), in pertinent part, prohibits a plan fiduciary from causing a plan to enter into a "direct or indirect:" "(C) furnishing of goods, services, or facilities between the plan and a party in interest" or a "(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

99.     Causing a transaction prohibited by ERISA § 406(a) renders a fiduciary liable under ERISA § 409 unless the transaction is exempted by ERISA § 408, 29 U.S.C. § 1108.

100.    In pertinent part, ERISA § 3(14), 29 U.S.C. § 1002(14) defines the term "party in interest" to include any plan fiduciary as well as any "person providing services to such plan."

101.    Defendant Aon was a party in interest because it was a service provider to the Caterpillar Plan as the Caterpillar Plan's recordkeeper and platform services provider.

102.    Defendant AFA was a party in interest because it was a fiduciary and because it was a service provider through the [[investment advisory agreement.]]

103.    Financial Engines was a party in interest because it was a fiduciary and because it was a service provider through the [[original investment advisory agreement.]]

104.    During the Caterpillar Plan's initial, direct relationship with Financial Engines:

a.    the ongoing services provided by Financial Engines were prohibited transactions under ERISA § 406(a)(1)(C) and the payments to Financial Engines, which were

made from the assets of the Caterpillar Plan, were prohibited transactions under ERISA § 406(a)(1)(D), and

b. the payments from Financial Engines to Defendant Aon were "direct or indirect" payments of Plan assets and as such were prohibited transactions under ERISA § 406(a)(1)(D).

105. During the subsequent, indirect relationship between the Caterpillar Plan and AFA:

a. the ongoing services provided by AFA were prohibited transactions under ERISA § 406(a)(1)(C) and the payments to AFA, which were made from the assets of the Caterpillar Plan, were prohibited transactions under ERISA § 406(a)(1)(D), and

b. the payments from AFA to Defendant Aon were "direct or indirect" payments of Plan assets and as such were prohibited transactions under ERISA § 406(a)(1)(D).

106. The Caterpillar Defendants had actual or constructive knowledge that the transactions set forth in ¶¶ 103-104 took place as well as the terms of the transactions, and that the transactions involved services provided to the Plan by parties in interest and/or transfers of Plan assets from the Plan to parties in interest.

107. Under ERISA § 409(a), 29 U.S.C. § 1109(a), a fiduciary that violates any of ERISA's duties, including ERISA § 406(a)(1)(C) and (D), must "make good" to the plan the losses to the plan resulting from its violations of ERISA § 406(a)(1)(C) and (D), and is "subject to such other equitable or remedial relief as the court may deem appropriate."

108. Thus under ERISA §§ 502(a)(2) and 409(a), 29 U.S.C. §§ 1132(a)(2) and 1109(a), the Caterpillar Defendants are liable, in an amount to be determined at trial, for the losses to the Caterpillar Plan caused by its violations of ERISA § 406(a)(1)(C) and (D), and are "subject to such other equitable or remedial relief" as the Court "may deem appropriate."

26

### COUNT III
### On Behalf of the Caterpillar Class and the Aon Plans Class
### Knowing Participation in and Receipt of Benefit from Prohibited Transaction
### ERISA §502(a)(3), 29 U.S.C. § 1132(a)(3)
### Against the Aon Defendants

109. Plaintiffs repeat and reallege each of the allegations in the foregoing paragraphs as if fully set forth herein.

110. For the reasons set forth above, the direct and indirect transactions between the Caterpillar Plan and the Aon Defendants were prohibited transactions under ERISA § 406(a)(1)(C) and (a)(1)(D). Similarly, the similarly structured direct and indirect transactions between the other Plans and the Aon Defendants were prohibited transactions under ERISA § 406(a)(1)(C) and (a)(1)(D) for precisely the same reasons.

111. The Aon Defendants were aware of the existence of the Plans and the circumstances that rendered the transactions in question prohibited under ERISA § 406(a). Nevertheless, the Aon Defendants engineered, participated in, and received the benefits of these transactions despite their actual or constructive knowledge that they were prohibited by ERISA § 406(a)(1)(C) and (a)(1)(D). Moreover, the Aon Defendants provided no material services in exchange for the money they received from these transactions, and were, as such, gratuitous transferees.

112. ERISA § 502(a)(3) permits a plan participant to bring a civil action to obtain appropriate equitable relief to enforce the provisions of Title I of ERISA or to enforce the terms of a plan.

113. The Supreme Court has held that anyone, including a non-fiduciary, who receives the benefit of conduct that violates ERISA may be subject to equitable remedies under ERISA § 502(a)(3) if they have "actual or constructive knowledge of the circumstances that rendered the

transaction unlawful." *Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000).

114.    The Aon Defendants' receipt of the payments at issue here amounted to the ill-gotten proceeds of prohibited transactions in violation of the provisions of Title 1 of ERISA. The Aon Defendants have profited from these prohibited transactions in an amount to be proven at trial, and on information and belief they remain in possession of at least some of proceeds that belong in good conscience to the Caterpillar Plan and/or the Plans. All such money that belongs in good conscience to the Caterpillar Plan and/or the Plans is subject to a constructive trust in favor of the Caterpillar Plan and/or the Plans, for which Defendants serve as constructive trustees. As constructive trustees, under ERISA § 502(a)(3) Defendants must disgorge to the Caterpillar Plan and/or the Plans all such money or the product thereof that is traceable to the prohibited transactions as well as any profits made thereon.

115.    The Aon Defendants had actual or constructive knowledge that the transactions set forth in ¶¶ 109-111 and 113 took place, as well as the terms of the transactions, that the transactions involved services provided to the Plans by parties in interest and/or resulted in transfers of Plan assets from the Plans to parties in interest, and that the indirect compensation Aon and/or AFA would receive from Financial Engines, in the case of plans that contracted for the PAM Program directly with Financial Engines,  and the direct compensation that Aon and/or AFA retained in the case of those plans that contracted for the PAM Program indirectly through AFA, were both excessive and unreasonable in relation to the services being provided by Aon and/or AFA.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      Certify this action as a class action as stated here and appoint Plaintiffs' counsel as Class Counsel pursuant to Federal Rule of Civil Procedure 23;

B.      Declare that the Caterpillar Defendants breached their fiduciary duties;

C.      Enjoin Defendants from further violations of their fiduciary responsibilities, obligations, and duties and from further engaging in transactions prohibited by ERISA;

D.      Order that Defendants make good to the Plans the losses resulting from their serial breaches of fiduciary duty;

E.      Order that Defendants disgorge any profits that they have made through their breaches of fiduciary duty and prohibited transactions and impose a constructive trust and/or equitable lien on any funds received by Defendants therefrom;

F.      Order any other available equitable relief, or remedies, including but not limited to, the imposition of a surcharge, the restoration of the Plans to the position they would have been but for the breaches of fiduciary duty and self-dealing; and any other kind of relief and/or damages available pursuant to ERISA §§ 409 and 502(a)(2) and (3);

G.      Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the Plans;

H.      Order Defendants pay treble the actual damages caused by its violations of 18 U.S.C. § 1954, plus interest, attorney's fees, costs and any other applicable statutory penalties;

I.      Order Defendants to pay prejudgment interest; and

J.      Award such other and further relief as the Court deems equitable and just.

DATED:  June 18th, 2018                      Respectfully submitted,

By: */s/ James A. Bloom*
    Garrett W. Wotkyns (*Pro Hac Vice*)
    John J. Nestico (*Pro Hac Vice*)
    SCHNEIDER WALLACE COTTRELL

KONECKY WOTKYNS LLP
8501 N. Scottsdale Road, Suite #270
Scottsdale, AZ 85253
Telephone: (415) 421-7100
Facsimile: (866) 505-8036

Todd M. Schneider (*Pro Hac Vice*)
Kyle G. Bates (*Pro Hac Vice*)
James A. Bloom (*Pro Hac Vice*)
SCHNEIDER WALLACE COTTRELL
KONECKY WOTKYNS LLP
2000 Powell Street, Suite 14000
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105

Suyash Agrawal
Eli Kay-Oliphant
MASSEY & GAIL LLP
50 E. Washington Street, Suite 400
Chicago, Illinois 60602
Telephone: (312) 283-1590

Ellen T. Noteware (*Pro Hac Vice*)
Todd Collins (*Pro Hac Vice*)
Shannon J. Carson (*Pro Hac Vice*)
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 875-3000

***Attorneys for Plaintiff***

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 18th, 2018, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court Northern District of Illinois, by using the Court's CM/ECF system.

I certify that all the participants in the case are registered CM/ECF users and will be served by the Court's CM/ECF system.

By: */s/ Kelle J. Winter*
Kelle J. Winter
